Squire Patton Boggs (US) LLP
Matthew F. Miller (State Bar # 172661)
matthew.miller@squirepb.com
Nisha S. Patel (State Bar # 269234)
nisha.patel@squirepb.com
275 Battery Street, Suite 2600
San Francisco, California  94111
Telephone:     +1 415 954 0200
Facsimile:     +1 415 393 9887

Attorneys for Plaintiff
COMET TECHNOLOGIES USA INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COMET TECHNOLOGIES USA INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>DOUGLAS BEUERMAN, an individual, and DOES 1-10,<br><br>Defendants. | Case No.  5:18-cv-1441<br><br>**COMPLAINT**<br><br>**(1) Violation of the Defend Trade Secrets Act (18 U.S.C. § 1836 *et seq.*)**<br><br>**(2) Violation of the California Uniform Trade Secrets Act (Cal. Civ. Code § 3426 *et seq.*)**<br><br>**(3) Breach of Contract**<br><br>**(4) Breach of Fiduciary Duty and Duty of Loyalty**<br><br>**(5) Unfair Business Practices (Cal. Bus. & Prof. Code § 17200 *et seq.*)**<br><br>**(6) Violation of the California Computer Data Access and Fraud Act (Cal. Pen. Code § 502**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff COMET TECHNOLOGIES USA INC., ("Comet" or "Plaintiff") complains

against Defendant DOUGLAS BEUERMAN ("Beuerman" or "Defendant") as follows:

## NATURE OF THE CASE

1.      Comet brings this action to prevent its ex-employee Beuerman from exploiting its

most valuable research and development trade secrets at a key competitor XP Power LLC ("XP

Power") and from recruiting Comet employees to join XP Power.  In his final days of employment, Beuerman first misappropriated Comet's trade secrets and then repeatedly lied to Comet's management about his actions demonstrating his intent to compete unfairly at all costs. Moreover, in violation of his employee non-solicitation clause, Beuerman persuaded at least one of his direct reports, Eiji Mori ("Mori"), to leave Comet and join him at XP Power.

2.     Beuerman was the Director, Match Network Research and Development ("R&D") of Comet's Plasma Control Technologies ("PCT") Business Unit, a high-level manager with access to Comet's most valuable trade secret and confidential information.  Just days after receiving an offer of employment from XP Power, and immediately prior to giving notice, Beuerman accessed, reviewed and downloaded to an external memory drive abundant trade secret and confidential information associated with Comet's newest intellectual property.  Both Comet and XP Power (through its recent acquisition of Comdel Inc. ("Comdel")) sell generators to companies in the semiconductor industry such as Applied Materials, Inc.

3.     Days later on his final day of employment, Beuerman attached yet another new external memory drive to his computer and accessed (and presumably downloaded) more of Comet's confidential files.  Within just hours of these last downloads, Beuerman lied in his exit interview about copying any company documents to any external drives or media.  He then lied about his next employer, refusing to identify them, but falsely claiming they were not in competition with Comet.  As well known to Beuerman, XP Power directly competes with Comet and the intellectual property stolen by Beuerman would benefit XP Power immensely while depriving Comet of its strategic advantage.

4.     Just one day after Beuerman gave his notice of resignation to Comet, his direct report, Mori, also gave notice of his resignation to Comet.  Similar to Beuerman, Mori lied about his next employer, refusing to identify them when in fact he had been recruited by Beuerman to join him at XP Power.

5.     This action is based upon Beuerman's: (1) Violation of the Defend Trade Secret Act, 18 U.S.C. § 1836, *et seq.*; (2) Violation of the California Uniform Trade Secret Act, Cal. Civ. Code § 3246, *et seq.*; (3) Breach of Contract; (4) Breach of Fiduciary Duty and Duty of

SQUIRE PATTON BOGGS (US) LLP
275 Battery Street, Suite 2600
San Francisco, California 94111

COMPLAINT
CASE NO. _____

Loyalty; (5) Unfair Business Practices, Cal. Bus. & Prof. Code § 17200 *et seq*; and (6) Violation of the California Computer Data Access and Fraud Act, Cal. Pen. Code § 502.

## PARTIES

6.      Comet is a Delaware corporation with a principal place of business located at 2360 Bering Drive, San Jose, California 95131.

7.      Comet is informed and believes, and on that basis alleges, that Beuerman resides in Boulder Creek, California.

## JURISDICTION

8.      This Court has original jurisdiction over this action pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836 and 28 U.S.C. § 1331.

9.      This Court has supplemental jurisdiction over the other claims asserted herein pursuant to 28 U.S.C. § 1367.

## VENUE

10.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Beuerman resides in Boulder Creek, California which is located in the Northern District of California. Venue is also proper because a substantial part of the events or omissions giving rise to the claims pled herein occurred in the Northern District of California and a substantial part of the property that is the subject of the claims is situated in the Northern District of California. Specifically, the misappropriated trade secret and confidential information was accessed, viewed and downloaded by Beuerman in the Northern District of California. Comet is informed and believes that its trade secret and confidential information resides in the Northern District of California on, at minimum, external memory drives in Beuerman's possession.

## INTRADISTRICT ASSIGNMENT

11.      This is an action for trade secret misappropriation, breach of contract, breach of fiduciary duty and duty of loyalty, unfair business practices, and unlawful computer data access where a substantial part of the events or omissions which give rise to the claims have taken place in Santa Clara County and where a substantial part of the property that is subject to the action is situated in Santa Cruz County. Thus, pursuant to Civil L.R. 3-2(c) and (e), this action should be

SQUIRE PATTON BOGGS (US) LLP
275 Battery Street, Suite 2600
San Francisco, California 94111

COMPLAINT
CASE NO. _____

assigned to the San Jose Division.

## FACTUAL ALLEGATIONS

### *Comet Diligently Protects Its Business Intelligence and Trade Secret / Confidential Information*

12.     The Comet Group is a globally leading technology firm, headquartered in Switzerland.  Having been in business for almost 70 years, Comet Group has over 1200 employees in seven countries.  Comet Group's primary product lines include x-ray, radio frequency and ebeam technology.  The Comet Group operates in the United States through a wholly owned subsidiary, Plaintiff Comet Technologies USA Inc.

13.     Comet Group operates a segment/division titled Plasma Control Technologies ("PCT") with an important presence in San Jose, California.  Here, Plaintiff Comet develops and produces radio frequency ("RF"), vacuum technology and power equipment ("matchboxes") for sale to customers in the semiconductor industry worldwide.  In other Comet Group locations in Europe (e.g. Flamatt/Switzerland and Stolberg/Germany) Comet PCT develops other equipment (particularly generators).  Matchboxes and generators aim at the same customer group, and often are sold as a package, but they are completely different products.  Generators serve as the RF power source; they generate high frequency power, and control it very precisely.  Matchboxes are located behind and are connected to the generators.  Matchboxes transform the generator's RF output signal so that it can be supplied into the plasma chamber (which is the final application used by the end customer).  Within Comet PCT, the development of generators and matchboxes is handled by separate teams.  Comet's main customers for its matchboxes and generators are based in California.  Comet's products are used for precise control of plasma processes like thin-film deposition and etching for semiconductors, flat panel displays, solar panels and industrial coatings.

14.     In Europe, Comet stands at the forefront of RF technology and constantly innovates and develops new RF solutions.  Most recently, Comet's European team undertook development of new RF controls, embedded systems and digital measurements under the internal project name "Da Vinci."  Comet has devoted many millions of dollars towards this Da Vinci

SQUIRE PATTON BOGGS (US) LLP
275 Battery Street, Suite 2600
San Francisco, California 94111

COMPLAINT
CASE NO. _____

project.  Indeed, Da Vinci represents one of the most important ongoing development project for the Comet Group, and Comet expects to generate annual turnovers based on this technology of several hundred million dollars.  Through its Da Vinci project, Comet expects a significant first-mover advantage over its industry competitors.

15.     Comet has acted reasonably and diligently to protect the secrecy of its trade secret and confidential information related to its future RF technology, especially control, embedded systems and digital measurements, including the Da Vinci project, by the following measures:

- requiring employees to execute Proprietary Information, Inventions and Non-Compete Agreements, which includes confidentiality, non-disclosure, and return of property obligations;

- requiring employees to sign acknowledgments in which they agree to abide by Comet's non-disclosure/confidentiality agreements and Technology Use Policies, which prohibit improper use or disclosure of Comet's trade secret and confidential information;

- using a database exchange and collaboration system called Jira/Confluence ("Confluence"), which allows permission assignment ("who can see what" and tracking "who changed what, when and why")

- granting permission rights to the Confluence system in a restrictive fashion: only members of the R&D core team have access to it, and mirroring the hierarchy levels in the Comet R&D organization;

- maintaining high password and technical standards for access and security of the Confluence database;

- performing exit interviews in which Comet's managers discuss the continuing nature of one's duties of confidentiality to Comet, as well as detailed questions about return of company documents, diligently seeking return of its property including its trade secret and confidential information;

- requiring that employees reaffirm their confidentiality, non-disclosure, and return of property obligations upon termination of employment through execution of a Separation of Employment Agreement and Termination Certificate which reiterates one's continuing confidentiality obligation and seeks affirmative representation that no company documents are retained.

### *Beuerman's Duties and Promises to Protect Trade Secret / Confidential Information*

16.     Comet hired Beuerman in 2011 as Director, Match Network Research and Development ("R&D") in the San Jose location of the Plasma Control Technologies ("PCT")

SQUIRE PATTON BOGGS (US) LLP
275 Battery Street, Suite 2600
San Francisco, California 94111

COMPLAINT

CASE NO. _____

Business Unit, reporting directly to the Comet Group's Vice President Global R&D.  Beuerman was responsible for providing management, leadership and all oversight functions for Match Network R&D.  Beuerman's responsibilities included all aspects of managing the 19 employees of the PCT R&D group in the San Jose location (including hiring and firing employees), R&D document management for the San Jose location (including file storage, retrieval and sharing), and managing product transfers from R&D to production.  Beuerman also had signing authority for Match R&D and no budgetary limit.  Due to these functions, Beuerman was part of the overall R&D management team.  Therefore, Beuerman's document permissions in the Confluence work collaboration system were set in a way that he could view all data in the "R&D space" (a special subsection in Confluence).  However, Beuerman could not delete any data, and any modifications that he performed were tracked and saved in the system.

17.     Since mid-2017, Beuerman's primary job responsibilities were to manage and lead the San Jose software and hardware teams, which were working on the improvement of the actual matchbox controls (based on an older technology "Generation 2.0" first developed in or around 2011).  This technology was managed exclusively in the San Jose location, and had no technological interface with the latest Generation 3.0 Da Vinci technology, currently under development in Europe and only for generators.

18.     On February 11, 2016, Beuerman entered into a Proprietary Information, Inventions and Non-Compete Agreement (the "Confidentiality Agreement") with Comet (attached hereto as Exhibit A), which provides that:

> [Beuerman] agree[s] to hold in confidence and not directly or indirectly use or disclose, either during or after termination of [his] employment with [Comet], any Proprietary Information [he] obtain[s], access[es] or create[s] during the period of [his] employment, whether or not during working hours, except to the extent authorized by [Comet], until such Proprietary Information becomes generally available to the public.  [Beuerman] agree[s] not to make copies of such Proprietary Information except as authorized by the Company.  [Beuerman] will not reproduce or appropriate for [his] own use, or for the use of others, any property, Proprietary Information or Company Inventions.

SQUIRE PATTON BOGGS (US) LLP
275 Battery Street, Suite 2600
San Francisco, California 94111

COMPLAINT
CASE NO. _____

The Confidentiality Agreement defines Proprietary Information as follows:

> any and all confidential and/or proprietary knowledge, data or information of [Comet], its parents, subsidiaries, and affiliated entities, customers and suppliers, including but not limited to information relating to employees, customer lists, products, services, processes, know-how, business plans, designs, formulas, methods, developmental or experimental work, improvements, discoveries, inventions, ideas, source and object codes, data, programs, other works of authorship, and plans for research and development, whether learned or acquired prior to or after this Agreement.

The Confidentiality Agreement also provided that:

> Upon termination of [Beuerman's] employment with [Comet] for any reason whatsoever, voluntarily or involuntarily, and at any earlier time [Comet] requests, [Beuerman] will deliver to the person designated by [Comet] all originals and copies of all Proprietary Information in [his] possession or control, including but not limited to drawings, specifications, documents, records, devices, models, notes, memorandum or any other material and copies or reproductions thereof and shall permit [Comet] to inspect and delete files containing Proprietary Information from personal computing devices [Beuerman] may own but which [he] utilized from time to time during the course of [his] employment such as personal computers, personal digital assistants, tablets, etc.

Moreover, the Confidentiality Agreement states that:

> During the term of [his] employment and for twelve (12) months following [his] termination of employment for any reason, [Beuerman] will not recruit any employee of [Comet] as of the date of the termination of [his] employment or solicit or induce, or attempt to induce, any such individuals or contractors to terminate their employment with, or otherwise cease their relationship with [Comet].

19.     Beuerman also agreed to comply with Comet's Technology Use Policy in Comet's Employee Handbook (the Technology Use Policy and acknowledgment of the Employee Handbook are attached hereto as Exhibit B) which provides:

> All Company IT Assets, including any and all data accessible by or set forth therein, are furnished or made available to users are property of COMET, are intended for business use only, and shall only be used for authorized Company business.  All Company IT Assets, and all communications and data created, transferred, transmitted, downloaded, copied, received or stored on, by or to a

SQUIRE PATTON BOGGS (US) LLP
275 Battery Street, Suite 2600
San Francisco, California 94111

COMPLAINT
CASE NO. _____

Company IT Asset, are the exclusive property of COMET to the extent consistent with applicable law.

Company data, databases, programs, and other proprietary information represent Company assets and can only be used for authorized Company business. Use of Company assets for personal gain or benefit is prohibited. Sharing Company proprietary information with unauthorized Company personnel or third parties is prohibited.

Users are prohibited from:

- Accessing, obtaining, or using information from Company IT Assets for any purpose other than advancing the Company's business interests (e.g., accessing information on a Company IT Asset for the purpose of establishing or assisting a competing enterprise).

- Manually or systematically forwarding, or transferring company data to any third party file storage or sharing service is prohibited unless approved by IT.

***Beuerman's Unlawful Theft of Comet's Trade Secret / Proprietary Information***

20.     In the days leading up to his resignation from Comet, Beuerman investigated methods to conceal his unauthorized download and misappropriation of trade secret and confidential information. On January 14, 2018, the same day on which Beuerman would misappropriate copious amount of Comet's trade secret and confidential information, Beuerman queried an internet site providing instructions on how to avoid detection when emailing documents to personal Google accounts.  The webpage detailed how Beuerman could prevent others from "Find[ing] out what searches you did or sites you visited" and from "See[ing] that your account was signed in."

21.     Beuerman also performed google searches and queried a webpage to determine the legal implications of recruiting Comet's employees.  On January 6, Beuerman performed the following google searches:

- "california laws recruiting employees;"
- "prohibited hiring practices California;" and
- "can i recruit employees from my previous employer."

COMPLAINT
CASE NO. _____

SQUIRE PATTON BOGGS (US) LLP
275 Battery Street, Suite 2600
San Francisco, California 94111

Beuerman also visited a webpage titled "Legally Poaching Employees From Another Company (and Preventing It).

22.     On or about January 11, 2018, Beuerman received an offer of employment from XP Power.  XP Power is a provider of power solutions in direct competition with Comet as both companies produce RF generators for the semiconductor industry.  XP Power recently purchased Comdel, a company that, like Comet, sells generators to Applied Materials.

23.     Three days later, on or about Sunday January 14, 2018, and one day prior to his resignation from Comet, Beuerman used his work laptop to log into Comet's collaboration system Confluence.  He entered into the "R&D team space," and then entered into the separate space "RF Power Amplifiers."  Beuerman had never before accessed or contributed to this space.  Beuerman then accessed and downloaded to a private external memory device over one hundred documents from various Sub-Folders containing Comet's newest intellectual property developments by Comet's European R&D teams (including the Da Vinci project).  These files contained all R&D information required to reproduce the future RF power amplifiers, combining networks and control systems including:

- Complete schematics and PCB layouts;
- 3D drawings and models of new components;
- Assembly and production instructions of new components;
- Simulation as well as measurement results;
- Pictures of newly assembled and tested components; and
- Drawings describing the intellectual property for future RF power delivery concepts.

Beuerman methodically accessed these folders, one after the other.  On the most competitively sensitive pages, he used the function "download all attachments/data from this page" for downloading large swaths of Comet's developing technology documents.  He did not download the data to his work laptop, instead copying directly to a newly created folder that Beuerman titled "Confluence" on a private external USB storage device.

24.     Beuerman had no legitimate business purpose to access, view, use, or download such trade secret and confidential information in his position at Comet.

25.     The documents that Beuerman accessed and downloaded, in the hands of a competitor such as XP Power, would unfairly deprive Comet of its significant competitive

SQUIRE PATTON BOGGS (US) LLP
275 Battery Street, Suite 2600
San Francisco, California 94111

- 9 -

COMPLAINT
CASE NO. _____

advantage.

26.     Once again on or about the morning of January 26, Beuerman attached yet another external memory device to his work computer and presumably downloaded company documents to that device. While this particular device was attached to his computer, Beuerman accessed numerous of Comet's consultant and independent contractor agreements for multiple individuals.

***Beuerman's Resigns From Comet and Reaffirms his Promises to Protect Trade Secret / Confidential Information***

27.     On the day after Beuerman's mass misappropriation of documents, January 15, 2018, Beuerman accepted his position at XP Power and then provided his direct supervisor André Grede with a letter notifying Comet of his resignation of employment from Comet.

28.     Beuerman's last day of employment with Comet was January 26, 2018.  On that day, Comet conducted an exit interview with Beuerman.  An outside counsel to Comet attended the interview; an action that should have highlighted to Beuerman the importance that Comet placed upon his honesty and candor during this interview.

29.     During the exit interview, Beuerman reaffirmed his promises to protect trade secret and confidential information and return all Comet property.  Beuerman executed a Separation of Employment Agreement (attached hereto as Exhibit C) which provides that:

> Employee reaffirms and agrees to observe and abide by the terms of the confidentiality agreements Employee signed during Employment.

The Separation of Employment Agreement also provided that:

> Employee acknowledges that Employee has delivered to the Company, or destroyed in a manner sufficient to ensure confidentiality, all documents, including records, data, notes, reports, e-mail messages, proposals, lists, and correspondence, whether in hard copy form or electronically stored that were provided to Employee by the Company, developed or obtained by Employee as a result of Employee's working relationship with the company, or otherwise belonging to the Company, its parents, affiliates, successors or predecessors.  Employee also agrees that Employee has delivered to the Company all equipment belonging to the Company, its parents, affiliates, successors or predecessors, including cell phones, laptops, and key cards.

30.     Beuerman also signed a Termination Certification (attached hereto as Exhibit D) with Comet during his exit interview in which he states:

SQUIRE PATTON BOGGS (US) LLP
275 Battery Street, Suite 2600
San Francisco, California 94111

COMPLAINT
CASE NO. _____

I hereby certify that I do not have in my possession (whether in hard copy of electronic form on any computer, tablet, smartphone, storage device, electronic mail or cloud drive), nor have I failed to return, any devices, equipment, and all originals and copies of all Proprietary Information in my possession or control, including but not limited to drawings, specifications, documents, records, models, notes, memorandum or any other material belonging to COMET Technologies USA, Inc. (the "Company") or to its parent company(ies), subsidiaries, or affiliates.

I further certify that I have not transferred outside the Company's or its parent company(ies), subsidiaries', or affiliates' names any Proprietary Information (whether in hard copy or electronic form on any computer, tablet, smartphone, storage device, electronic mail or cloud drive).

. . .

I further certify that I have complied with all the terms of the Company's Proprietary Information, Inventions And Non-Solicitation Agreement signed by me, including the reporting of any inventions and original works of authorship (as defined in that agreement), conceived or made by me (solely or jointly with others) covered by that agreement.
I further agree that, in compliance with the Proprietary Information, Inventions And Non-Solicitation Agreement, I will preserve as confidential all Company Property Information including any and all confidential and/or proprietary knowledge, data or information of the Company, its parents, subsidiaries, and affiliated entities, customers and suppliers, including but not limited to information relating to employees, customer lists, products, services, processes, know-how, business plans, designs, formulas, methods, developmental or experimental work, improvements, discoveries, inventions, ideas, source and object codes, data, programs, other works of authorship, and plans for research and development. I will not, at any time, use the Company's Proprietary Information in any manner including but not limited to soliciting the business of any customer of the Company.

I also agree that for twelve (12) months from this date, I will not either directly or indirectly solicit, induce, recruit or encourage any of the Company's employees to leave their employment, or to enter into an employment, consulting, contractor, or other relationships with any other person, firm, business entity, or organization (including with myself).

31.     During the exit interview, Comet confronted Beuerman about accessing and viewing various trade secret and confidential information in Comet's Confluence data system that were not related to Beuerman's ongoing work at Comet.  Beuerman did not deny accessing those pages and was unable to come up with a rational explanation for his actions.  Beuerman then lied, affirmatively stating that he only downloaded certain documents to his work laptop and to no

SQUIRE PATTON BOGGS (US) LLP
275 Battery Street, Suite 2600
San Francisco, California 94111

COMPLAINT
CASE NO. _____

other devices.  When specifically asked to turn in any external memory devices or thumb drives containing Comet property, Beuerman stated that he had no such devices or drives.  Finally, he lied about his next employer, refusing to identify them and falsely claiming they were not in competition with Comet.  As well known to Beuerman, XP Power directly competes with Comet as both companies sell generators to companies in the semiconductor industry such as Applied Materials.

### Beuerman Recruits Other Employees to Leave Comet and Join its Competitor, XP Power

32.     As described above, Beuerman's employment contracts prohibited solicitation of fellow employees. In the days leading up to his resignation and acceptance of an offer to work for XP Power, Beuerman performed google searches and queried a webpage to determine the legal implications of recruiting Comet's employees.  On January 6, Beuerman performed the following google searches:

- "california laws recruiting employees;"
- "prohibited hiring practices California;" and
- "can i recruit employees from my previous employer."

Beuerman also visited a webpage titled "Legally Poaching Employees From Another Company (and Preventing It).

33.     On January 16, 2018, one day after Beuerman gave notice of his resignation, two other employees that directly reported to Beuerman simultaneously gave notice. Chris Mason ("Mason") was a SMTS RF Engineer while employed at Comet.

34.     Also on January 16, 2018, Eiji Mori ("Mori") gave Comet notice of his resignation of employment from Comet.  Mori directly reported to Beuerman and was a Senior RF Engineer while employed at Comet.

35.     Beuerman, Mason and Mori each submitted resignation notices strikingly similar in appearance and wording, indeed containing multiple identical phrases.   The three employees drafted the letters in the same font style and size.  Each letter has nearly identical phrases and language informing Comet of their resignations, the effective dates of their resignations and exit dates, the reason for their resignations, their sentiments regarding working at Comet, and

SQUIRE PATTON BOGGS (US) LLP
275 Battery Street, Suite 2600
San Francisco, California 94111

COMPLAINT
CASE NO. _____

willingness in helping with the transition of their duties.

36.     Comet is informed and believes and on that basis alleges that Beuerman persuaded Mason and Mori, both direct reports, to leave Comet and join him at XP Power and Beuerman has formed a plan to poach more employees from Comet to join XP Power.

## FIRST CAUSE OF ACTION
### Violation of the Defend Trade Secrets Act (18 U.S.C. § 1836 *et seq.*)

37.     Comet re-alleges and incorporates by reference the allegations in paragraphs 1 through 36 as though fully set forth here.

38.     Comet's trade secret and confidential information relates to products or services used, sold, purchased, or transported, or intended for use, sale, purchase, or transport, across the country and throughout the world.

39.     Comet's trade secret and confidential information, as described above in paragraph 23, constitutes "trade secrets" within the meaning of 18 U.S.C. § 1839(3).

40.     The above detailed trade secret and confidential information that Beuerman accessed and downloaded to private external drives derives independent economic value, both actual and potential, from not being generally known to and not being readily ascertainable through proper means by Comet's competitors, including XP Power, or to other persons or entities who might obtain economic value from their disclosure or use.

41.     At all times relevant herein, Comet has taken the above-described reasonable measures to protect the secrecy of its trade secret and confidential information, including that which Beuerman has misappropriated.

42.     Beuerman's actions, as set forth herein, constitute "misappropriation" within the meaning of 18 U.S.C. § 1839(5).

43.     Beuerman accessed and downloaded Comet's trade secret and confidential information by improper means, without Comet's express or implied consent.

44.     Beuerman knew or had reason to know at the time he accessed, downloaded or used Comet's trade secret and confidential information that this information was acquired and maintained by improper means and/or under circumstances giving rise to a duty to maintain

COMPLAINT

CASE NO. _____

SQUIRE PATTON BOGGS (US) LLP
275 Battery Street, Suite 2600
San Francisco, California 94111

secrecy or limit use.

45.     Beuerman has failed to return to Comet the trade secret and confidential information that he misappropriated.

46.     Upon information and belief, Beuerman is retaining and using Comet's trade secret and confidential information to compete with and/or otherwise harm Comet.

47.     Beuerman's misappropriation has proximately caused damages to Comet, including but not limited to loss of profits, goodwill, competitive advantage and business opportunities.

48.     Beuerman has been unjustly enriched as a further proximate result of his misappropriation of Comet's trade secret and confidential information.

49.     Beuerman's actions in misappropriating Comet's trade secret and confidential information was willful, fraudulent, malicious, and was done with the intent to injure and oppress Comet and improve Beuerman's own economic opportunities, thereby justifying an award of punitive damages against Beuerman pursuant to 18 U.S.C. § 1836(b)(3)(C) and attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

50.     Comet is also entitled to temporary, preliminary, and permanent injunctive relief to protect its confidential and trade secret information by 1) enjoining Beuerman from using or disclosing Comet's trade secret and confidential information; and 2) enjoining Beuerman from altering or deleting Comet's trade secret and confidential information; and 3) requiring Beuerman to turn over any and all copies of Comet's trade secret and confidential information to both Comet's and Beuerman's own counsel.

**SECOND CAUSE OF ACTION**
**Violation of the California Uniform Trade Secrets Act (Cal. Civ. Code § 3426 *et seq.*)**

51.     Comet re-alleges and incorporates by reference the allegations in paragraphs 1 through 50 as though fully set forth here.

52.     Comet's trade secret and confidential information, as described above in paragraph 23, constitutes "trade secrets" within the meaning of Cal. Civil Code § 3426.1.

53.     The above detailed trade secret and confidential information that Beuerman

SQUIRE PATTON BOGGS (US) LLP
275 Battery Street, Suite 2600
San Francisco, California 94111

COMPLAINT
CASE NO. _____

accessed and downloaded to private external drives derives independent economic value, both actual and potential, from not being generally known to and not being readily ascertainable through proper means by Comet's competitors, including XP Power, or to other persons or entities who might obtain economic value from their disclosure or use.

54.     At all times relevant herein, Comet has taken the above-described reasonable measures to protect the secrecy of trade secret and confidential information, including that which Beuerman has misappropriated.

55.     Beuerman's actions, as set forth herein, constitute "misappropriation" within the meaning of Cal. Civil Code § 3426.1.

56.     Beuerman accessed and downloaded Comet's trade secret and confidential information by improper means, without Comet's express or implied consent.

57.     Beuerman knew or had reason to know at the time he accessed, downloaded or used Comet's trade secret and confidential information that this information was acquired and maintained by improper means and/or under circumstances giving rise to a duty to maintain secrecy or limit use.

58.     Beuerman has failed to return to Comet the trade secret and confidential information that he misappropriated.

59.     Upon information and belief, Beuerman is retaining and using Comet's trade secret and confidential information to compete with and/or otherwise harm Comet.

60.     Beuerman's misappropriation proximately caused damages to Comet, including but not limited to loss of profits, goodwill, competitive advantage and business opportunities.

61.     Beuerman has been unjustly enriched as a further proximate result of his misappropriation of Comet's trade secret and confidential information.

62.     Beuerman's actions in misappropriating Comet's trade secret and confidential information was willful, fraudulent, malicious, and was done with the intent to injure and oppress Comet and improve Beuerman's own economic opportunities, thereby justifying an award of punitive damages against Beuerman pursuant to Cal. Civil Code section 3426.3(c) and attorneys' fees pursuant to Cal. Civ. Code § 3426.4.

SQUIRE PATTON BOGGS (US) LLP
275 Battery Street, Suite 2600
San Francisco, California 94111

COMPLAINT
CASE NO. _____

SQUIRE PATTON BOGGS (US) LLP
275 Battery Street, Suite 2600
San Francisco, California 94111

63.     Comet is also entitled to temporary, preliminary, and permanent injunctive relief to protect its confidential and trade secret information by 1) enjoining Beuerman from using or disclosing Comet's trade secret and confidential information; and 2) enjoining Beuerman from altering or deleting Comet's trade secret and confidential information; and 3) requiring Beuerman to turn over any and all copies of Comet's trade secret and confidential information to both Comet's and Beuerman's own counsel.

## THIRD CAUSE OF ACTION
### Breach of Contract

64.     Comet re-alleges and incorporates by reference the allegations in paragraphs 1 through 63 as though fully set forth here.

65.     By his actions described above, including improperly accessing, downloading and retaining Comet's trade secret and confidential information and by recruiting and soliciting Comet employees to leave Comet and join him at XP Power, Beuerman breached his Confidentiality Agreement, Technology Use Policy, Separation of Employment Agreement and Termination Certification.

66.     Comet complied with and fulfilled its obligations under those Agreements, which are lawful and binding upon the parties.

67.     As a direct and proximate result of Beuerman's breach, Comet has sustained and will sustain damages.

## FOURTH CAUSE OF ACTION
### Breach of Fiduciary Duty and Duty of Loyalty

68.     Comet re-alleges and incorporates by reference the allegations in paragraphs 1 through 67 as though fully set forth here.

69.     Beuerman owed fiduciary duties to Comet due to his position and duties as a Director.  Beuerman maintained a position of trust and confidence at Comet, and was in a role as a high-level manager with discretionary power to manage corporate affairs.  He had authority for hiring and firing employees, and signing contracts on behalf of the company with no budgetary limit.

COMPLAINT
CASE NO. _____

SQUIRE PATTON BOGGS (US) LLP
275 Battery Street, Suite 2600
San Francisco, California 94111

70.     As an employee of Comet, Beuerman also owed Comet his undivided loyalty.  He was required to act with the utmost good faith and in the best interests of Comet.

71.     Comet was entitled to place its trust and confidence in Beuerman and to expect Beuerman to carry out his business at Comet with the utmost good faith.  Comet relied on Beuerman's loyalty and integrity and his faithful performance of his duties and responsibilities.

72.     Beuerman knowingly acted adverse to Comet's interests as described above, including the taking and retaining of Comet's trade secrets and confidential information and the recruitment and solicitation of Comet's employees to join XP Power.

73.     Comet did not give informed consent to Beuerman's conduct.

74.     As a direct and proximate cause of Beuerman's conduct, Comet has been damaged.

75.     Beuerman has also acted willfully and with malice toward Comet, intending to cause Comet injury by retaining Comet's trade secrets.

## FIFTH CAUSE OF ACTION
### Unfair Business Practices (Cal. Bus. & Prof. Code § 17200 *et seq.*)

76.     Comet re-alleges and incorporates by reference the allegations in paragraphs 1 through 75 as though fully set forth here.

77.     Beuerman's business acts and practices, as alleged herein, constitute unlawful and unfair acts or practices, and thereby constitute unfair competition in violation of California Business & Professions Code § 17200.

78.     Beuerman acted unlawfully and unfairly by misappropriating Comet's trade secret and confidential information; retaining trade secrets and confidential information; recruiting and soliciting Comet employees to join XP Power and engaging in numerous other actions as set forth in detail herein.

79.     As a direct and proximate cause of Beuerman's unlawful and unfair acts, Comet has been damaged.

\\\

\\\

COMPLAINT
CASE NO. _____

### SIXTH CAUSE OF ACTION
**Violation of California's Computer Data Access and Fraud Act (Cal. Pen. Code § 502)**

80.     Comet re-alleges and incorporates by reference the allegations in paragraphs 1 through 79 as though fully set forth here.

81.     Beuerman's conduct, as alleged herein, violated Cal. Penal Code § 502(c).

82.     Beuerman knowingly accessed and without permission took, copied or made use of Comet's data and supporting documentation from a computer, computer system, or computer network.

83.     Beuerman knowingly and without permission used Comet's data, computer, computer system and/or computer network, wrongfully to control or obtain trade secret and confidential information and data.

84.     Beuerman knowingly and without permission accessed or caused to be accessed Comet's computer, computer system, or computer network.

85.     Beuerman's conduct, as alleged herein, proximately caused damages to Comet, including but not limited to loss of profits, goodwill, competitive advantage and business opportunities.

86.     Beuerman's conduct, as alleged herein, was willful, fraudulent, malicious, and was done with the intent to injure and oppress Comet and improve Beuerman's own economic opportunities, thereby justifying an award of punitive damages against Beuerman.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Comet prays for judgment in its favor and against Defendant Beuerman, inclusive as follows:

1.     Awarding damages as described in each of the above claims, in favor of Comet and against Beuerman in amounts to be determined at trial;

2.     Granting temporary, preliminary and permanent injunction against Beuerman, requiring him to return all stolen information and documents (and all material derivative from such information) to Comet and enjoining him from further violating his legal and contractual duties to Comet, from misappropriating or from using Comet trade secret and confidential

COMPLAINT

CASE NO. _____

SQUIRE PATTON BOGGS (US) LLP
275 Battery Street, Suite 2600
San Francisco, California 94111

1    information;

2           3.      Awarding punitive damages in favor of Comet and against Beuerman in an amount

3    to be determined at trial;

4           4.      Awarding Comet pre-judgment and post-judgment interest, its attorneys' fees and

5    costs, and other expenses incurred in this action;

6           5.      Granting Comet such other further relief as this Court deems just and proper.

7                                          **JURY DEMAND**

8           Comet demands a jury trial for all issues triable.

9    Dated:  March 1, 2018                         Squire Patton Boggs (US) LLP

10

11                                                 By:   /s/Matthew F. Miller
12                                                       Matthew F. Miller
                                                         Nisha S. Patel
13                                                       Attorneys for Plaintiff
                                                         COMET TECHNOLOGIES USA INC.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT
CASE NO. _____

**SQUIRE PATTON BOGGS (US) LLP**
275 Battery Street, Suite 2600
San Francisco, California 94111

**Exhibit A**

**COMET TECHNOLOGIES USA, INC.**
**PROPRIETARY INFORMATION, INVENTIONS AND NON-COMPETE AGREEMENT**

In consideration of my initial and/or continued employment with COMET Technologies USA, Inc. and/or its subsidiaries, including but not limited to PCT Engineered Systems, LLC (collectively, the "***Company***"), and the compensation now and hereafter paid to me, and for the Company's agreement to provide me with access to its Proprietary Information and other knowledge, I hereby agree as follows:

**1. <u>Confidentiality of Proprietary Information</u>.**

      **1.1 Proprietary Information.**  As used herein, "***Proprietary Information***" means any and all confidential and/or proprietary knowledge, data or information of the Company, its parents, subsidiaries, and affiliated entities, customers and suppliers, including but not limited to information relating to employees, customer lists, products, services, processes, know-how, business plans, designs, formulas, methods, developmental or experimental work, improvements, discoveries, inventions, ideas, source and object codes, data, programs, other works of authorship, and plans for research and development, whether learned or acquired prior to or after this Agreement.

      **1.2 Confidentiality.**  I agree to hold in confidence and not directly or indirectly use or disclose, either during or after termination of my employment with the Company, any Proprietary Information I obtain, access or create during the period of my employment, whether or not during working hours, except to the extent authorized by the Company, until such Proprietary Information becomes generally available to the public.  I agree not to make copies of such Proprietary Information except as authorized by the Company.  I will not reproduce or appropriate for my own use, or for the use of others, any property, Proprietary Information or Company Inventions (as defined below).

**2. <u>Assignment of Inventions</u>.**

      **2.1 Proprietary Rights.**  As used herein, "***Proprietary Rights***" means all trade secret, patent, copyright, mask work and other intellectual property rights throughout the world.

      **2.2 Inventions.**  As used herein, "***Inventions***" means all trade secrets, inventions, mask works, ideas, concepts, processes, formulas, source and object codes, data, programs and related documents, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques.

      **2.3 Prior Inventions.**  I have set forth on <u>Exhibit A</u> hereto a complete list of all Inventions that I have, alone or jointly with others, made prior to the commencement of my employ-



Technology with Passion

**COMET Technologies USA Inc.**
100 Trap Falls Road Ext., Shelton, CT 06484
Tel. 203-447-3186, Fax 203-925-0370
www.cometusa.com

ment with the Company that I consider to be my property or the property of third parties and that I wish to have excluded from the scope of this Agreement (collectively referred to as **"Prior Inventions"**). If no such disclosure is attached, I represent that there are no Prior Inventions. I agree that I will not incorporate, or permit to be incorporated, Prior Inventions in any Company Inventions without the Company's prior written consent. Notwithstanding the foregoing, if, in the course of my employment with the Company, I incorporate a Prior Invention into a Company product, process or machine, or otherwise cause the Company to use such Prior Invention, the Company is hereby granted and shall have a nonexclusive, royalty-free, irrevocable, perpetual, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to make, have made, modify, use and sell such Prior Invention for all purposes.

2.4 **Assignment of Inventions.** Subject to Section 2.6 hereof, I hereby assign and agree to assign in the future (when any such Inventions or Proprietary Rights are first reduced to practice or first fixed in a tangible medium, as applicable) to the Company all my right, title and interest in and to any and all Inventions (and all Proprietary Rights with respect thereto) that (i) were made during the term of my employment with the Company; (ii) were made with the Company's equipment, supplies, facilities, trade secrets or time; (iii) relate, at the time of conception or of reduction to practice, to the business of the Company or the Company's actual or demonstrably anticipated research and/or development; and/or (iv) result from any work performed by me for or on behalf of the Company (the "**Company Inventions**"). I agree that such Company Inventions are the sole and exclusive property of the Company. In the case of any "other works of authorship," such assignment will be limited to those works which meet both conditions (ii) and (iv) above. To the extent not already owned by the Company or assigned to the Company pursuant to this Agreement and applicable law, I agree to assign in the future (when any such Company Inventions or Proprietary Rights are first reduced to practice or first fixed in a tangible medium, as applicable) to the Company all my right, title and interest in and to any and all Company Inventions (and all Proprietary Rights with respect thereto) and I will, at the Company's request (whether during or after my employment), promptly execute a written assignment to the Company of any such Company Invention, and I will preserve any such Invention as part of the Proprietary Information of the Company. Notwithstanding the foregoing, this Agreement does not apply to, and I have no obligation to assign to the Company, an invention that I develop entirely on my own time without using the Company's equipment, supplies, facilities or trade secret information, unless the invention (i) relates, at the time of conception or reduction to practice of the invention, to the Company's business, or actual or demonstrably anticipated research or development of the Company or (ii) results from any work performed by me for the Company.

2.5 **Obligation to Keep Company Informed.** I will promptly and fully disclose in writing to the Company all Inventions during my employment and for six (6) months after my employment. I agree to assist in every proper way and to execute those documents and take such acts as are reasonably requested by the Company to obtain, sustain and from time to time enforce patents, copyrights and other rights and protections relating to Inventions in the United States or



any other country.  If I fail or refuse to sign documents necessary to secure or enforce the Company's rights, or if the Company is unable for any other reason to secure my signature on any document for this purpose, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, to sign such documents and do all other lawfully permitted acts in connection with the foregoing.

     **2.6  Government or Third Party.**  I also agree to assign all my right, title and interest in and to any particular Invention to a third party, including without limitation the United States, as directed by the Company.

**3.  <u>No Conflicting Obligation</u>.**  I represent that my performance of all the terms of this Agreement and as an employee of the Company does not and will not breach any agreement to keep in confidence proprietary information, knowledge or data acquired by me in confidence or in trust prior to my becoming an employee of the Company, and I will not disclose to the Company, or induce the Company to use, any confidential or proprietary information or material belonging to any previous employer or third party.  I agree not to enter into any written or oral agreement that conflicts with the provisions of this Agreement.

**4.  <u>Return of Company Documents</u>.**  Upon termination of my employment with the Company for any reason whatsoever, voluntarily or involuntarily, and at any earlier time the Company requests, I will deliver to the person designated by the Company all originals and copies of all Proprietary Information in my possession or control, including but not limited to drawings, specifications, documents, records, devices, models, notes, memorandum or any other material and copies or reproductions thereof and shall permit the Company to inspect and delete files containing Proprietary Information from personal computing devices I may own but which I utilized from time to time during the course of my employment such as personal computers, personal digital assistants, tablets, etc.

**5.  <u>Legal and Equitable Remedies</u>.**  Because my services are personal and unique and because I may have access to and become acquainted with the Proprietary Information, the Company shall have the right to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief, without bond and without prejudice to any other rights and remedies that the Company may have for a breach of this Agreement.  I acknowledge and agree that the obligations and restrictions in this Agreement are reasonable and necessary to protect the Company's legitimate interests and that violation thereof will result in irreparable injury to the Company.

**6.  <u>Notices</u>.**  Any notices required or permitted hereunder shall be given to the appropriate party at the address specified below or at such other address as the party shall specify in writing. Such notice shall be deemed given upon personal delivery to the appropriate address or if sent by certified or registered mail, three (3) days after the date of mailing.



**7.** **Employment.**  I agree and understand that nothing in this Agreement shall confer any right with respect to continuation of employment by the Company, nor shall it interfere in any way with my right or the Company's right to terminate my employment at any time, with or without cause and with or without notice.

**8.** **Non-Solicitation of Employees**.  During the term of my employment and for twelve (12) months following my termination of employment for any reason, I will not recruit any employee of the Company as of the date of the termination of my employment or solicit or induce, or attempt to induce, any such individuals or contractors to terminate their employment with, or otherwise cease their relationship with, the Company.  Following the termination of my employment with the Company, I will not, at any time, use the Company's Proprietary Information in any manner including but not limited to soliciting the business of any customer of the Company or soliciting any Company employee.

**9.** **Remedies for Breach**.  I stipulate that the covenants contained herein are essential for the protection of the trade secrets, confidential business and technological information, relationships, and competitive position of the Company; that a breach of any covenant contained herein would cause the Company irreparable damage for which damages at law would not be an adequate remedy; and that, in addition to damages and other remedies to which the Company would otherwise be entitled, it will be entitled to whatever injunctive relief is appropriate for any such breach.  I also agree that I will be responsible for attorney fees and other legal expenses incurred by the Company or its successors or assign to enforce any of the covenants in this Agreement against me provided the Company prevails in such action.  In addition to such other rights and remedies as the Company may have at equity or in law with respect to any breach of this Agreement, if I commit a material breach of any of the provisions, the Company shall have the right and remedy to have such provisions specifically enforced by any court having equity jurisdiction.  The term(s) of any covenant(s) in paragraph 8 will not run during any time in which I am in violation of said covenant(s).

**10.** **General Provisions and Severability.**  This Agreement will be governed by and construed according to the laws of the State of California, without reference to conflict of laws principles.  If any part of this Agreement is deemed by a court or other tribunal to be unenforceable or unreasonable as to scope, activity, territory, duration, or in any other respect, then (i) such finding shall not affect any other provisions of this Agreement, which shall otherwise remain in full force and effect, and (ii) such court or other tribunal may either (a) modify the scope, activity, territory, duration or other aspect of it to such extent as the court or tribunal shall deem necessary to render it reasonable and enforceable, or (b) enforce it partially, to effect a lesser restriction as the court or tribunal shall deem reasonable.  This Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Company, its successors, and its assigns.  The provisions of this Agreement shall survive the termination of my employment and the assignment of this Agreement by the Company to any successor in in-



terest or other assignee.  No waiver by the Company of any breach of this Agreement shall be a waiver of any preceding or succeeding breach.  No waiver by the Company of any right under this Agreement shall be construed as a waiver of any other right.  The obligations pursuant to Sections 1 and 2 of this Agreement shall apply to any time during which I was previously employed, or am in the future employed, by the Company as a consultant if no other agreement governs nondisclosure and assignment of inventions during such period.  This Agreement is the final, complete and exclusive agreement of the parties with respect to the subject matter hereof and supersedes and merges all prior discussions between us.  No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing and signed by the party to be charged.  Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

**Dated:** _02/11/2016_

_(signature)_
**(Signature)**

_Douglas Beverman_
**(Printed Name)**

_____
**(Address)**
_Boulder Creek, CA_

<u>**EXHIBIT A**</u>

**TO:   COMET Technologies USA, Inc.**

**FROM:**  _____

**DATE:**  _____

**SUBJECT: Previous Inventions**

**1.** Except as listed in Section 2 below, the following is a complete list of all inventions or improvements relevant to the subject matter of my employment by the Company that have been made or conceived or first reduced to practice by me alone or jointly with others prior to my engagement by the Company:

    **A. No inventions or improvements.**

    **B. See below:**

        _____

        _____

        _____

    **C. Additional sheets attached.**

**2.** Due to a prior confidentiality agreement, I cannot complete the disclosure under Section 1 above with respect to inventions or improvements generally listed below, the proprietary rights and duty of confidentiality with respect to which I owe to the following party(ies):

|   | Invention or Improvement | Party(ies) | Relationship |
|---|---|---|---|
| 1. | _____ | _____ | _____ |
| 2. | _____ | _____ | _____ |
| 3. | _____ | _____ | _____ |

    **D. Additional sheets attached.**



**Exhibit B**



# U.S. Employee Handbook

When disposing of Personal Information, physical documents must be redacted or shredded so that the Personal Information cannot be practicably read/viewed or recovered. Similarly, electronic files and any disk or device containing Personal Information must be securely disposed of to prevent recovery of the Personal Information. If an employee becomes aware of a potential breach of security or the loss or theft of Personal Information, they must report it immediately to Human Resources or an appropriate management staff member.

6. ***Departing Employees, Consultants, & Service Providers:*** All employees, consultants, and service providers must return and, upon request, destroy all Personal Information provided by The Company before their departure or earlier.

7. ***Violations:*** Any violations of this Policy, including careless, accidental, or intentional disclosures of Personal Information, may result in disciplinary action, up to and including termination of employment or all existing business relationships with the Company. Violators may also be subject to civil or criminal litigation in a court of law. The Company will evaluate the appropriate disciplinary measures and legal actions on a case-by-case basis.


## TECHNOLOGY USE POLICY

The provisions of this policy apply to all Company employees. The provisions of this policy also apply to any third party (e.g., contractor, consultant) who obtains or is granted access to Company IT Assets (defined below).

All employees are responsible for understanding this policy and ensuring its uniform and effective implementation, as well as ensuring that their conduct and actions are wholly consistent with its requirements.

**Purpose**

This policy provides employees with information and guidance regarding the acceptable and authorized use of Company IT Assets.  COMET seeks to protect the Company, its employees, and its business partners from liability and interruptions due to inappropriate use of company computers, software and systems, and breaches of computer security.

**General Use Principles**

Users are responsible for adhering to the requirements set forth in this policy concerning acceptable and authorized use of Company IT Assets. If there is any uncertainty regarding acceptable or authorized use, users should consult the IT Department.  As a general rule, if a user would be uncomfortable asking for permission, it is probably not an acceptable use of Company IT Assets.

All Company IT Assets, including any and all data accessible by or set forth therein, are furnished or made available to users are property of COMET, are intended for business use only, and shall only be used for authorized Company business.  All Company IT Assets, and all communications and data created, transferred, transmitted, downloaded, copied, received or stored on, by or to a Company IT Asset, are the exclusive property of COMET to the extent consistent with applicable law.

The Company provides IT Assets to users for business purposes. However, the Company recognizes that employees are made more efficient in work efforts by allowing some personal

use of Company IT Assets. Any personal software or applications are not supported by the Company's IT Department.  In addition, while some personal activities may be legal, they may not be ethical or appropriate for the work place. Accordingly, there are a significant number of software programs, applications or web sites which are not appropriate to be related to a Company IT Asset and will not be allowed. Users with any question as to the appropriateness of a specific software program, application or web site should contact the Corporate IT Manager for specific guidance.

COMET provides network resources and Company IT Assets to allow users to share data for collaborative efforts and to provide a secure location for data backup. The use of network resources for storage of non-work related data, graphics or other files is prohibited. Any material of this nature that is found on Company IT Assets is subject to deletion without warning.

The Company strives to maintain a workplace free of harassment and will not tolerate employees using Company IT Assets in ways that are or may be disruptive, offensive to others, or harmful to morale.

All users are required to sign and return the *Acceptable Use Policy Acknowledgment Form*. Failure to do so may result in disciplinary action up to and including denial or termination of employment or business relationship.

**Backup**
Temporary copies of work files can be made on laptops or other mobile devices for work offsite but should be reloaded onto the original network drive upon return. Backups of all corporate data are performed by the IT Services Department on a regularly scheduled basis.

**Unauthorized Changes to Company Computers**
Only the IT Department is authorized to purchase and install computer software or hardware on COMET-managed systems. This includes material ordered directly for a project that is to be installed on Company-owned computers. COMET computer systems are designed and documented to prevent loss of data and provide an audit.

**Purchases of Computer Software and Equipment**
The purchase of computer software and equipment for Company use is prohibited without approval from departmental management and the IT Department. All computer software and hardware purchases must be procured through the IT Department to meet pre-established quality requirements and be compatible with other Company computer software and equipment.  The IT Department must hold or have a copy of all original software distribution media and licenses.

**Personal Use of Computers**
Incidental and occasional personal use of Company computers is permitted for reasonable activities that do not need substantial computer hard disk space or other computer equipment, and as long as the use does not interfere with official duties, inhibit the security of information and information systems, or cause degradation of network services.

**Proprietary Information**
Company data, databases, programs, and other proprietary information represent Company assets and can only be used for authorized Company business. Use of Company assets for personal gain or benefit is prohibited. Sharing Company proprietary information with unauthorized Company personnel or third parties is prohibited.



**Termination of Employment**

All information on user computers is considered Company property. Deleting, altering, or sharing confidential, proprietary, or any other information upon termination requires management authorization. Upon termination of employment, all electronic devices provided to employees or paid for by the Company during the employee's tenure must be returned promptly to the Human Resources Department or the IT Department, together with the password, identification code, and any other appropriate information necessary for the Company to permit uninterrupted use of the device and access to the information contained thereon.

**Users are prohibited from:**

- Accessing, obtaining, or using information from Company IT Assets for any purpose other than advancing the Company's business interests (e.g., accessing information on a Company IT Asset for the purpose of establishing or assisting a competing enterprise).
- Using Company IT Assets to actively engage in conduct, or procuring or transmitting material, that is in violation of company policy or applicable workplace laws or regulations.
- Using Company IT Assets for commercial activity (e.g., creating products or services for sale).
- Transmit, display or reproduce any information, text, or images that could be deemed inappropriate, derogatory, prejudicial, lewd, offensive or harassing (e.g., sending repeated, unwanted e-mail to another individual); transmit, display or reproduce sexually explicit information, text, images, jokes, and/or cartoons; harass or threaten others, including the use of ethnic slurs, racial comments, off-color jokes, or anything that may be construed as harassment or showing disrespect for others; or access or display of inappropriate websites (e.g, pornography, dating services, gambling, or other sites that may be offensive or inappropriate).
- Soliciting or proselytizing for commercial ventures, charitable organizations, religious or political causes, outside organizations, or other non-business related matters during business hours.
- Violating the rights of any person or company protected by copyright law (or its fair use provisions), trade secret, patent or other intellectual property, or similar laws or regulations, including, but not limited to:
    - Unauthorized copying or reproduction of copyrighted material including, but not limited to, digitization and distribution of photographs from magazines, books or other copyrighted sources, and copyrighted music, movies, text, or images; and installation or distribution of "pirated" or other copyrighted software for which neither the Company nor the end user have an active license.
    - Violating the terms of applicable software licensing agreements (e.g., illegally duplicating software and/or its related documentation).
- Knowingly or carelessly performing any act that will interfere with the normal operation of Company IT Assets.
- Altering delivered computer configuration settings.
- Engaging in any activity that wastes or overloads Company IT Assets (e.g., network bandwidth).
- Gaining unauthorized access to any Company IT Assets.
- Sending inappropriate mass mailings (e.g., "spamming," "flooding," "bombing") not directly associated with, or in the performance of, the routine course of duties or assignments (e.g., multiple mailings to newsgroups, mailing lists, or individuals).
- Reading, copying, changing, or deleting another user's files or software without the explicit agreement of the user.

- Taking Company IT Assets home for use on a personal computer.
- Acceptable and unacceptable uses of Company IT Assets are not completely identified in sections above. Users must consider if the activity is appropriate for business.
- Where personal use of a Company IT Asset is contemplated, the user must consider if the activity is appropriate for the work place. If users have any question regarding acceptable use, they should contact the Corporate IT Director.
- Manually or systematically forwarding, or transferring company data to any third party file storage or sharing service is prohibited unless approved by IT. This restriction also applies to forwarding of email to non-company supplied or approved mailboxes.

**System and Network Activities**

***The following System and Network activities are strictly prohibited:***

- Connecting unauthorized equipment to Company IT Assets, to include hubs, routers, printers or other equipment connected to the Company's network directly or via remote attachment.
- Making unauthorized attempts to circumvent data protection schemes or uncover security loopholes (e.g., creating and/or running programs that are designed to identify security loopholes and/or decrypt intentionally secure data).
- Introducing, running or installing malicious programs into or on a Company network or server that may damage or place excessive load on any Company IT Asset (e.g., DoS, viruses, worms, Trojan horses, e-mail bombs, etc.).
- Revealing account passwords to others or allowing use of a user's account by others (including family and other household members when work is being done at home).
- Effecting security breaches or disruptions of network communication(s). Security breaches include, but are not limited to, accessing data of which the employee is not an intended recipient or logging into a server or account that the employee is not expressly authorized to access, unless these duties are within the scope of regular duties. For purposes of this section, "disruption" includes, but is not limited to, network sniffing, ping floods, packet spoofing, denial of service, and forged routing information for malicious purposes.
- Port scanning or security scanning unless prior notification to IT is made.
- Executing any form of network monitoring which will intercept data not intended for the user's host, unless this activity is part of the user's normal job duties.
- Circumventing user authentication or security of any host, network or account.
- Using any program/script/command, or sending messages of any kind, with the intent to interfere with, or disable, a user's session, via any means, locally or via the Internet/Intranet.
- Providing information about, or lists of, Company employees to parties outside the Company or beyond the user's specific job requirements.
- Effectuating any Company network changes unless prior approval has been granted by the IT Department. These changes include, but are not limited to, adding a hub, switch, or router to the COMET network, or moving a PC, swapping a computer with another, or modifying office wiring.

**E-mail and Communication Activities**

The principal purpose of e-mail is for Company business communications. Such communications shall not be considered private or personal to any individual user.



**The following activities are strictly prohibited:**
- Sending jokes in any form (regardless of whether the person receiving the joke finds it offensive or inappropriate).
- Sending unsolicited e-mail messages, including the sending of "junk mail" or other advertising material to individuals who did not specifically request such material (e.g., e-mail Spam).
- Any form of harassment whether through language, frequency, or size of messages.
- Unauthorized use, or forging, of e-mail header information.
- Forging the identity of a user or machine in an electronic communication.
- Solicitation of e-mail for any other e-mail address, other than that of the poster's account, with the intent to harass or collect replies.
- Creating or forwarding "chain letters," "Ponzi," or other "pyramid" schemes of any type.
- Use of unsolicited e-mail originating from within COMET networks or other Internet/Intranet service providers on behalf of, or to advertise, any service hosted by  or connected via a COMET network.
- Posting the same or similar non-business related messages to large numbers of Usenet newsgroups (e.g., newsgroup Spam).
- Attempting to monitor or tamper with another user's electronic communications.
- Making fraudulent offers of products, items, or services originating from any COMET account.

## PRIVACY AND MONITORING

The Company reserves the right, and will exercise the right, as necessary and appropriate, to randomly and periodically monitor, review, audit, intercept, access, and disclose all matters, communications, and activity on the Company's IT Assets, at any time, with or without notice.

This right applies equally to communications and activity related to both business and personal use by users. Monitoring includes the ability to capture web activity of a user, whether personal or otherwise, even if not connected to the Company's network or internet service system at the time the page is accessed, as well as store those images and URLs in temporary internet files.

Monitoring also includes the ability to access and review communications and user activity on Company IT Assets. Users who utilize the Company's IT Assets should expect their communications and activities are subject to monitoring and disclosure. Users have no right or reasonable expectation of privacy when using or accessing Company IT Assets – regardless of the purpose for which the IT Asset is being used or accessed.

The Company's right to monitor also applies to personal, password-protected, web-based e-mail accounts accessed by Users through Company IT Assets (e.g., accessing a personal Yahoo email account through a company-issued laptop, cell phone or other device). In other words, messages sent or received on a personal, web-based e-mail account even if not connected to the Company's network or internet service system, are subject to monitoring if Company IT Assets are used to access the account. Messages and other evidence of computer or network use may remain indefinitely on the Company IT Asset or in the Company's network memory and may be accessed by the Company at any time.

For security and network maintenance purposes, authorized individuals may record and track all software installed by users on Company IT Assets. The Company has also installed an automated system to detect access to inappropriate web sites and logs all internet and e-mail usage. These logs are available to management and are reviewed as appropriate. If a user

accidentally accesses an inappropriate website that is not blocked, the user is required to report the incident to their supervisor and the IT Manager immediately.

## ENFORCEMENT AND MODIFICATION

Any user found to have violated this policy may be subject to disciplinary action up to and including termination of employment or business relationship. This policy can only be modified or amended in writing by the COMET IT Department.

## CELLULAR PHONE

Cell phones may be assigned to employees provided there is a business need and management approval. Simple convenience is not a criterion for cell phone need. It is the responsibility of the manager, director, department head, or other executive to make the determination as to whether a company cell phone is warranted and the type of cell phone plan that is required.

### Criteria for Assigning Company Cell Phone

COMET considers the following criteria in making the determination for assigning a cell phone:

- The job requires considerable time outside the office (travel, meetings, conferences, etc.) and use of the cell phone facilitates the effective conduct of business operations while away.
- The job function of the employee requires him/her to be accessible outside of scheduled or normal working hours.
- The recipient of company cell phone must be a COMET employee; vendors, third party consultants or temporary workers are prohibited from having a COMET issued cell phone.

### Usage and Safety

Employees are prohibited from using a cell phone, hands on or hands off, or similar device while driving, whether the business conducted is personal or company-related.

This prohibition includes:

- Receiving or placing calls
- Checking for messages
- Text messaging
- Surfing the Internet
- Receiving or responding to email

### Mobile Device Guidelines

All mobile devices (personal or company provided) currently on the corporate cellular plan are subject to this and all corporate policies.

- All company provided mobile devices are to be acquired through the IT Department.
- No department is authorized to acquire company cell phones independently without the written approval of the IT Department.
- The company mobile plan will be monitored and adjusted appropriately should needs change and also to ensure the company is participating in the most efficient plan.



**EMPLOYEE HANDBOOK ACKNOWLEDGEMENT FORM**

I, the undersigned employee, understand and acknowledge that I have received a copy of the *COMET Technologies USA Inc. Employee Handbook January 2016*; that this Handbook summarizes the Company's policies, benefits, and practices; that it is furnished to me solely for my information; and that this Employee Handbook applies to all employees of COMET Technologies USA Inc. and its subsidiaries.

I further understand and acknowledge that:

- I have thoroughly read and will follow all the policies and practices set forth in this Handbook.

- This Employee Handbook and the policies, benefits and practices of the Company are not intended to create, nor should they be construed as creating, an express or implied contract of employment.  Unless I have signed a separate employment contract, my employment is at-will and that status can be changed only through a written contract signed by the Head of Administration.

- This Employee Handbook is not meant to be a complete description of the Company policies and procedures, but is intended as a guideline only. The Company reserves the right to modify, add to, or rescind any of its policies and benefits at any time and that any such modification will be effective immediately upon issuance.

- Violations of any aspect of this policy or any other Company policy may result in the Company taking disciplinary action against me, up to and including termination of employment.

- If I have any questions about the Company's benefits, policies, or practices, it is my responsibility to seek clarification from my supervisor, another member of senior management, or Human Resources.

- It is my responsibility to read, understand and comply with the contents and policies of the Handbook.

Understood, agreed, and accepted by:

_____          02/11/2016
(Employee's Signature)                                              (Date)

Douglas Beuerman

_____
(Employee's Printed Name)

# Exhibit C

## SEPARATION OF EMPLOYMENT

This Separation of Employment document outlines the details concerning your termination of employment with COMET Technologies USA Inc. (the "Company") as follows:

1. ***Termination Date.*** Employee is voluntarily separating from the Company and the last day of employment with the Company is **01/26/2018**.

2. ***Final Pay and Benefits.*** Employee acknowledges that the Company has paid all unused vacation due to Employee as of the Termination Date. Employee further acknowledges that Company has paid all unpaid wages due to Employee through and including the Termination Date. Company has also reimbursed Employee for all business expenses Employee has incurred. Employee's insurance benefits will cease on the Termination Date, other than Employee's health insurance benefits, which will cease on **01/31/2018**, subject to Employee's rights to continue Employee's health insurance under COBRA at Employee's own expense. Other than as provided in this paragraph, Employee will not accrue employee benefits after the Termination Date.

3. ***Preservation of Trade Secrets and Confidential Information.*** Employee reaffirms and agrees to observe and abide by the terms of the confidentiality agreements Employee signed during Employment.

4. ***Return of Company Property.*** Employee acknowledges that Employee has delivered to the Company, or destroyed in a manner sufficient to ensure confidentiality, all documents, including records, data, notes, reports, e-mail messages, proposals, lists, and correspondence, whether in hard copy form or electronically stored that were provided to Employee by the Company, developed or obtained by Employee as a result of Employee's working relationship with the company, or otherwise belonging to the Company, its parents, affiliates, successors or predecessors. Employee also agrees that Employee has delivered to the Company all equipment belonging to the Company, its parents, affiliates, successors or predecessors, including cell phones, laptops, and key cards.

Date: 01/26/2018

Doug Beuerman ("Employee")

Date: 01/26/2018

**COMET Technologies USA, Inc. ("Company")**
Zahra Awasthi, HR Manager/HRBP

## COMET
Technology with Passion

**COMET Technologies USA Inc.**
100 Trap Falls Road Extension, Shelton, CT 06484
Tel. (203)447-3165, Fax (203)925-0364
www.cometusa.com

**Exhibit D**

## TERMINATION CERTIFICATION

I hereby certify that I do not have in my possession (whether in hard copy or electronic form on any computer, tablet, smartphone, storage device, electronic mail or cloud drive), nor have I failed to return, any devices, equipment, and all originals and copies of all Proprietary Information in my possession or control, including but not limited to drawings, specifications, documents, records, models, notes, memorandum or any other material belonging to COMET Technologies USA, Inc. (the "**Company**") or to its parent company(ies), subsidiaries, or affiliates.

I further certify that I have not transferred outside the Company's or its parent company(ies), subsidiaries', or affiliates' networks any Proprietary Information (whether in hard copy or electronic form on any computer, tablet, smartphone, storage device, electronic mail or cloud drive).

I shall permit the Company to inspect and delete files containing Proprietary Information from personal computing devices I may own but which I utilized from time to time during the course of my employment such as personal computers, personal digital assistants, tablets, storage devices.

I further certify that I have complied with all the terms of the Company's Proprietary Information, Inventions And Non-Solicitation Agreement signed by me, including the reporting of any inventions and original works of authorship (as defined in that agreement), conceived or made by me (solely or jointly with others) covered by that agreement.

I further agree that, in compliance with the Proprietary Information, Inventions And Non-Solicitation Agreement, I will preserve as confidential all Company Proprietary Information including any and all confidential and/or proprietary knowledge, data or information of the Company, its parents, subsidiaries, and affiliated entities, customers and suppliers, including but not limited to information relating to employees, customer lists, products, services, processes, know-how, business plans, designs, formulas, methods, developmental or experimental work, improvements, discoveries, inventions, ideas, source and object codes, data, programs, other works of authorship, and plans for research and development. I will not, at any time, use the Company's Proprietary Information in any manner including but not limited to soliciting the business of any customer of the Company.

I also agree that for twelve (12) months from this date, I will not either directly or indirectly solicit, induce, recruit or encourage any of the Company's employees to leave their employment, or to enter into an employment, consulting, contractor, or other relationship with any other person, firm, business entity, or organization (including with myself).

After leaving the Company's employment, I will be employed by _____ in the position of _____.

_____

*Signature of employee*

Douglas Bcuerman

*Print name*

01/06/2018

*Date*

*Address for Notifications*   Boulder Creek 95006



**COMET Technologies USA Inc.**
100 Trap Falls Road Extension, Shelton, CT 06484
Tel. (203)447-3165, Fax (203)925-0364
www.cometusa.com

1